# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: : | |
| : | |
| KEVIN A. BERRY, : | Case Number 11-20346-JAD |
| : | |
| Debtor. : | Chapter 7 |
| _____X | |
| : | |
| GARY LINDNER, : | Adversary No. 11-2291-JAD |
| : | |
| Plaintiff, : | Doc. No. 13 |
| : | |
| v. : | |
| : | |
| KEVIN A. BERRY, : | |
| : | |
| Defendant. : | |
| _____X | |

## MEMORANDUM OPINION

The matter before the Court is an *Amended Complaint to Determine the Non-Dischargeability of Debt* owed to Plaintiff, Gary Lindner (the "Plaintiff") by Defendant, Kevin A. Berry (the "Debtor"), pursuant to 11 U.S.C. § 523(a)(2)(A). The matter is a core proceeding over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 28 U.S.C. § 1334. For the reasons set forth below, the Court finds that the Plaintiff has not met his burden to prove nondischargeability and the debt at issue is found to be dischargeable, and the relief sought in the *Amended Complaint* is denied.

I.

The Plaintiff initiated this adversary proceeding by filing a *Complaint to Determine the Non-Dischargeability of Debt* on June 2, 2011. The Debtor filed a *Motion to Dismiss Complaint* on July 5, 2011 (See Doc. # 8), which the Debtor admitted was moot after the Plaintiff filed an *Amended Complaint to Determine the Non-Dischargeability of Debt* on July 15, 2011. (See Doc. # 13). In the *Amended Complaint*, the Plaintiff alleges that a debt owed to Plaintiff by the Debtor, evidenced by a default judgment entered in the Court of Common Pleas of Allegheny County as GD07-017318, should be deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), because the Debtor obtained money from the Plaintiff under false pretenses, false representations, or actual fraud. (See Doc. # 1). The Debtor filed an *Answer to the Amended Complaint* on August 17, 2011 (See Doc. # 18), and a *Pre-Trial Statement* on May 22, 2012. (See Doc. # 44). Trial was held on June 5, 2012. The Plaintiff and the Debtor filed *Post-Trial Memorandums* on June 26, 2012 and July 17, 2012, respectively (See Docs. ## 49, 50). The matter is now ripe for decision.

II.

The Plaintiff owns Triangle Music, a vending company which leases juke boxes, pinball machines, video games, and other "amusements." (See Defendant's Exhibit A, *Deposition of Gary Lindner*, p. 6:1-6). In August of 2005, the Plaintiff began discussing a potential business opportunity involving Angel's Nightclub in

Pittsburgh, Pennsylvania ("Angel's") with Robert Marmarosa ("Pappy"), Ronald Marchesiano ("Duke"), and the Debtor. According to the Plaintiff, Pappy was the first to approach the Plaintiff, asking for the Plaintiff to lend money to Pappy, Duke, and the Debtor so "they could buy [a] business and ... real estate." (See Audio Recording of Hearing Held in Courtroom D, June 5, 2012 (1:48:36 - 1:48:50)).

On or about August 16, 2005, the Plaintiff, the Debtor, Duke and Pappy met to discuss details about purchasing Angel's from its owner, Michael Isaac ("Isaac"). Pursuant to this meeting, a loan agreement was executed (the "Loan Agreement") wherein the Plaintiff agreed to loan the Debtor, Pappy and Duke $20,000 to be repaid at $1,000 a month, beginning on October 1, 2005. (See Plaintiff's Exhibit 1). At this meeting, the Plaintiff provided four checks to the Debtor, each made payable to the Debtor in the amount of $5,000. (See Doc. # 13, ¶ 5). The Loan Agreement does not assert the purpose for the loan, and only sets forth the original loan amount and the payment terms.

The Plaintiff asserts that, in exchange for the loan, he received the "[right] to place machines in [the] new restaurant/bar." (See Doc. # 13, ¶ 4). The Plaintiff understood that his loan would be repaid through collecting money from the three amusement machines placed in Angel's; once the loan was repaid in full, the money collected by the machines would be split "50/50". (See Defendant's Exhibit A, *Deposition of Gary Lindner*, p. 18:3-4, p. 20:18-22).

The Plaintiff further avers that the $20,000 loan was to be used "to purchase [the] business and or the real estate on which it was located" (See Doc. # 13, ¶ 4), and "[t]o get our foot in the door, to give money to Michael Isaac towards the purchase of real estate and business" (See Audio Recording of Hearing Held in Courtroom D, June 5, 2012 (1:49:40 - 1:49:50)). However, while averring that he was told that the loan was needed to "to secure the rights to open the place," the Plaintiff admitted that "Bob, Pappy and Duke told [him] it was sort of lease-to-own deal with the money, the proceeds coming in from the nightclub to pay [Isaac] off," further acknowledging, "[b]ut that was none of my business. My business was to get paid back from the proceeds from the machines." (Defendant's Exhibit A, p. 13:10-17).

Meanwhile, the Debtor asserts that in exchange for the loan, the Plaintiff "was basically paying for the right to operate his equipment inside the building" (See Defendant's Exhibit D, *Deposition of Kevin Berry*, p. 18:3-4), and that the $20,000 loan was "to be used for operating costs." While the Debtor admitted he didn't "remember what was discussed as to exactly what was to be done with" the loan (See id. at p. 20:14-20), he asserted that the Plaintiff "never specified what was to be done with the money" (See id. at p.44: 20-23).

The Debtor cashed one of the four $5,000 checks provided to him by the Plaintiff on August 16, 2005. In his deposition, the Debtor stated that the money

from this check was used to buy liquor, alcohol and a Buick Riviera for Pappy. (See Defendant's Exhibit B, *Deposition of Robert F. Marmarosa*, p.21: 11-15).

According to the various parties involved, Angel's operated under the Debtor's, Pappy's, and Duke's management for approximately one month, although the exact length of time is disputed. The restaurant portion of the facility was never operated. At some point thereafter, Isaac changed the locks to Angel's, "ending the business opportunity for all involved." (See Defendant's Exhibit B, p. 18:22-24; Defendant's Exhibit C, *Deposition of Ronald Marchesiano*, p. 13:20; Defendant's Exhibit D, p. 27:11).

The Plaintiff's three machines remained in Angel's during that month, and the Plaintiff made at least one monetary collection from them. (See Audio Recording of Hearing Held in Courtroom D, June 5, 2012 (12:54:17 - 1:54:27)). The machines were removed before the locks were changed on Angel's and stored at Pappy's residence until the Plaintiff picked them up. (See id. at (1:54:54 - 1:55:00)). The Plaintiff testified that he learned that the Debtor was no longer involved with Angel's when Pappy called him to tell him to pick up his machines because "the deal fell through and [the Debtor] got thrown out." (See id. at (1:55:10 - 1:55:29)).

On September 12, 2005, Isaac and the Debtor both signed a document wherein Isaac stated he was returning the remaining three $5,000 checks to the Debtor. This document states the following:

-5-

> To Kevin Berry, which was for the down payment of the purchase of Angels Nightclub. If in the future Kevin Berry wants to purchase the club again.
> For the Business only   375,000.00
> For the Building only   572,000.00
> Total                   947,000.00

(Plaintiff's Exhibit 6).

The Debtor cashed the remaining three checks, totaling $15,000, on September 14, 2005 and September 15, 2005, but averred in his deposition that he subsequently paid "at least two-thirds" of the $15,000 back to Isaac. (See Defendant's Exhibit D, p. 35:1-6). After being asked if he felt any obligation to return the money back to the Plaintiff, the Debtor responded, "[i]f we were to go back into the restaurant at a later date, we would allow Mr. Lindner to continue to put his machines in and at that point recontinue on the thing of repaying him again." (Defendant's Exhibit D, p. 45:24-25; p. 46:1-3).

At some point after the locks were changed on Angel's, the Plaintiff, Pappy and Duke took a trip to St. Mary's, Pennsylvania to meet with the Debtor in an attempt to collect money he owed each of them, including the $20,000 owed to the Plaintiff. At that time, the Debtor wrote out several checks to the Plaintiff and Duke in an attempt to start paying back the money he owed to them. (See Defendant's Exhibit D, p. 53:4-18; Defendant's Exhibit A, p. 24:6-20; Defendant's Exhibit C, *Deposition of Ronald Marchesiano*, p.21:1-21).

On August 13, 2007, after the Debtor failed to repay the remainder of the $20,000 loan, the Plaintiff filed a complaint against the Debtor in the Court of

-6-

Common Pleas of Allegheny County for breach of contract and trespass. (See Case No. GD07-017318). The Debtor was served with the complaint but did not respond; as such, a default judgement was entered against him on November 13, 2007 for $18,900. The Debtor filed for bankruptcy under Chapter 7 of the Bankruptcy Code on January 21, 2011.

### III.

Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor in order to offer debtors relief "from the weight of oppressive indebtedness and provide them with a fresh start." Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir.1995). However, the bankruptcy system acts to balance "allowing an 'honest but unfortunate debtor' a fresh start, while ensuring that a 'deceitful debtor' does not benefit from his or her own fraud." Corso v. Walker (In re Walker), 439 B.R. 854, 859 (Bankr.W.D.Pa. 2010), aff'd sub nom. Corso v. Walker, 449 B.R. 838 (W.D. Pa. 2011). Pursuant to 11 U.S.C. §523(a)(2)(A), "[a] discharge under section §727, §1141, §1228(a), §1228(b), or §1328(b) ... does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition." 11 U.S.C.A. §523.

To prevail on a nondischargeability claim pursuant to §523(a)(2)(A), the Plaintiff must prove that: (1) the debtor made a representation; (2) at the time of the representation, the Debtor knew it to be false; (3) the debtor made the misrepresentation with the intent and purpose of deceiving the creditor; (4) the Plaintiff justifiably relied on the misrepresentation; and (5) the Plaintiff sustained a loss or damage as the proximate consequence of the representation having been made. Hagar v. Beimel (In re Beimel), 406 B.R. 660, 666 (Bankr.W.D.Pa. 2009), citing 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e] at 523-45 to 46 (Bender 2008). The Plaintiff must prove each element by a preponderance of the evidence. Grogan v Garner, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed. 2d 775 (1991). Additionally, "as a threshold matter under ... § 523(a)(2)(A) ..., a creditor must demonstrate not only that a debtor made a fraudulent misrepresentation but also that such debtor obtained 'money, property, services, or an extension, renewal, or refinancing of credit' from such creditor by virtue of said misrepresentation." In re Booher, 284 B.R. 191, 200 (Bankr.W.D.Pa.2002).

The parties do not dispute that the Plaintiff has sustained damages as a proximate result of the Debtor's failure to repay the $20,000 loan. Plaintiff has suffered a loss of $18,800, the sum of the original loan amount minus $1,200, representing the sum of three payments the Debtor made to the Plaintiff after the entry of the default judgment. However, the Plaintiff has failed to meet his burden of proof with regard to all of the remaining elements.

The Plaintiff asserts that the Debtor represented to the Plaintiff that the Debtor "had an agreement to operate and purchase Angel's" (See Doc. # 49, p. 2), and that the purpose of the loan was to "secure the rights to operate" Angel's. The Plaintiff has not proven to this Court that the Debtor ever made such a representation, while knowing it was false, with the intent to deceive the Plaintiff. The Plaintiff has also failed to prove that he justifiably relied upon this misrepresentation. As such, this Court cannot deem this debt non-dischargeable, and thus finds in favor of the Debtor.

Specifically, the Plaintiff has failed to prove that the Debtor made the representation that he was obtaining loan proceeds to purchase Angel's knowing that it was false, and with the intent to deceive the Plaintiff. The Plaintiff argues that the Debtor's act of cashing the checks himself evidences that the Debtor "did not ... inten[d] to repay the Plaintiff, that the representations he made to induce Plaintiff to advance funds, and on which Plaintiff justifiably relied, were false." (See Doc. # 13, ¶ 11). However, "proof of intent for purposes of Section 523(a)(2)(A) must be measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services." Standard Bank & Trust v. Iaquinta (In re Iaquinta), 95 B.R. 576, 578 (Bankr.N.D.Ill.1989). The Debtor's must be measured by his subjective intention at the time of the execution of the Loan Agreement; what happened to the money a month later cannot conclusively determine the Debtor's requisite intent to deceive.

-9-

Furthermore, the Plaintiff admits that the agreement the Debtor had with Isaac may have been structured as a "rent-to-own" deal, but has not proven that the Debtor ever intended <u>not</u> to rent or operate Angel's. Rather, it appears that the Debtor, Pappy and Duke did make a plausible attempt to operate Angel's for some period of time. Pappy and Duke testified that they worked cleaning and preparing kitchen of the club in the hopes of operating a restaurant within the club, and Duke and the Debtor testified that they invested money in the club. (<u>See</u> Defendant's Exhibit C, p.18:7-24; Defendant's Exhibit D, p. 17: 4-5). While Kevin Berry, Pappy and Duke may have deceived themselves into thinking that they could successfully run a business with a highly undefined organizational structure it does not appear that they had the intent to deceive the Plaintiff. Thus, the Plaintiff has failed to prove the Debtor intended to deceive the Plaintiff when the parties executed the Loan Agreement.

The Plaintiff also cannot prove that he justifiably relied upon the Debtor's representation regarding the purpose of the loan. The parties operated Angel's under some kind of oral agreement with Isaac. No business records, receipts, or other documentary evidence have been presented purporting to show how Angel's was to be run and how the money was to be split up among the parties involved. In his deposition, the Plaintiff was asked whether he had the Debtor fill out a application for the loan, to which he replied, "No. Whenever I do business dealings, I look a guy in the eye, shake his hand and figure that's enough.

Apparently, it wasn't." (Defendant's Exhibit A, p.10:15-19). While the justifiable reliance standard would not require the Plaintiff to perform a audit of Angel's before loaning $20,000 to the Debtor, Pappy and Duke, the absence of any business records at all should have raised a red flag as to the viability of the business.[1] The Plaintiff's reliance upon an undocumented representation for a loan with no conditions and minimal terms was not justified here.

Additionally, the Plaintiff's own testimony indicates that he did not rely upon the Debtor's representations regarding the purpose of the loan. Rather, it appears that the Plaintiff relied only upon the Debtor's representation that in exchange for the loan, the Plaintiff would be allowed to place his machines in Angel's and collect money therefrom. When the Plaintiff was asked about his understanding of the deal between the Debtor and Isaac, he acquiesced that it was not "his business" (See Defendant's Exhibit A, p. 11:12-15 ("It wasn't any of my business."), p. 13:10-17 ("[T]hat was none of my business. My business was to get paid back from the proceeds from the machines.")), suggesting that the Plaintiff did not rely upon the representations of the Debtor, Duke and Pappy as to the specifics of the deal between the Debtor and Isaac, and for what purpose the loan

---

[1] "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." Field v. Mans, 516 U.S. at 71, citing W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971).

was to be used. Because it appears that the Plaintiff loaned the money in order to obtain the right to put his machines in Angel's, and was able to do so for a period of time, the Plaintiff also cannot demonstrate that the Debtor obtained the loan from the Plaintiff "by virtue of said misrepresentation." In re Booher, 284 B.R. at 200 (Bankr.W.D.Pa.2002). The Plaintiff therefore fails to prove that the Debtor had the requisite intent to deceive the Plaintiff under 11 U.S.C. § 523(a)(2)(A).

IV.

For the foregoing reasons, this Court finds that the Plaintiff has failed to prove by a preponderance of the evidence that the Debtor made a knowingly false representation to the Plaintiff with the intent and purpose to deceive the Plaintiff, and upon which the Plaintiff justifiably relied. Thus, the Plaintiff's *Amended Complaint to Determine the Non-Dischargeability of Debt* pursuant to 11 U.S.C. § 523(a)(2)(A) is denied. An appropriate Order shall be entered.

Dated: 10/2/12

JEFFERY A. DELLER
U.S. Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
James A Prostko, Esq.
Kirby L. Boring, Esq.
Alan R. Patterson, III, Esq.

**FILED**

OCT 0 2 2012

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST OF PENNSYLVANIA